UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 11-cv-80513-JMH

DEBORAH NASH-UTTERBACK,

      Plaintiff,

vs.

SCHOOL BOARD OF PALM BEACH COUNTY,

      Defendant.

_____/

FILED by _____ D.C.

JUN - 8 2012

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - W.P.B.

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DEs 28, 30)

**THIS CAUSE** is before this Court upon the parties' consent to magistrate judge jurisdiction and an Order referring the instant case to the undersigned United States Magistrate Judge for final disposition. (DE 12, 13, 15).

Presently before the Court is Defendant's Motion for Summary Judgment filed on April 2, 2012 (DE 28, 30) along with the Statement of Material Facts (DE 29). Plaintiff filed her Response (DE 46, 47, 49, 50) along with the Verified Response in Opposition to Defendant's Statement of Material Facts (DE 48) on April 23, 2012. Thereafter, Defendant filed its Reply papers (DE 55, 56, 57).[1] The Motion for Summary Judgement is now ripe for this Court's review. For the reasons stated below, Defendant's Motion for Summary Judgement is **DENIED**.

---

[1] Defendant filed its Motion to Strike Plaintiff's Memorandum of Law in Opposition to Defendant's Motion for Summary Judgment as Untimely Filed or in the Alternative Reply to Same (DE 55); Defendant's Motion to Strike, or in the Alternative, Reply to Plaintiff's Verified Response to Defendant's Statement of Material Facts (DE 56); and Defendant's Motion to Strike Portions of Plaintiff's Declaration Under Oath in Opposition to Defendant's Motion for Summary Judgement (DE 57).

## BACKGROUND

Plaintiff initiated this case in state court on April 08, 2011, and it was removed by the Defendant on May 5, 2011. (DE 1). The single-count Complaint alleges that Defendant School Board retaliated against the Plaintiff for exercising her First Amendment rights to free speech and association, and that this retaliation is actionable pursuant to 42 U.S.C. § 1983. (DE 1-2).

The crux of the allegations is that Plaintiff, Deborah Nash-Utterback ("Plaintiff" or "Nash-Utterback") spoke out against the School Board and its Superintendent, Dr. Arthur Johnson ("Superintendent" or "Dr. Johnson") and suffered adverse actions against her, the charter school she started, and her family members who were also employees of the Defendant School Board.

Plaintiff began her employment with the School Board in 1985, working first as a teacher and then as an assistant principal of adult education. Pl.'s Dep. p. 6 (DE 49-2). Plaintiff submitted an elementary charter school application to the Defendant and negotiated a charter contract, both of which were approved. Pl.'s Decl., ¶ 2 (DE 46).[2] Thereafter, Plaintiff took her first charter school leave of absence from employment with the Defendant School Board from September 16, 2004 until June 30, 2005 ("2004 - 2005 leave"). *Id.* Plaintiff was a Founding Board Member of the Boca Raton Charter School, Inc. ("BRCS") in 2004 - 2005; Principal of BRCS in 2006 - 2008; and Governing Board Member (Vice President) from 2009 through present. Pl.'s Answer to Def.'s Interrog. ¶ 17 (DE 49-1). Board Members are volunteers. *Id.* Thus, during her 2004 - 2005 leave, Plaintiff was an unpaid volunteer for BRCS. *Id.*; Pl.'s Decl., ¶ 2 (DE 46). Plaintiff was also an education consultant of charter school development for Boca Raton Community Hospital from September 2004

---

[2]In the Motion to Strike Portions of Plaintiff's Declaration Under Oath in Opposition to Defendant's Motion for Summary Judgement, Defendant does not object to any factual statements Plaintiff makes based on her personal knowledge. (DE 57).

until January 2005. Pl.'s Answer to Def.'s Interrog. ¶ 2 (DE 49-1).

Between February 2005 and June 2005, Plaintiff engaged in efforts to secure use for BRCS of the J.C. Mitchell Elementary School buildings (one of Defendant's schools), which had been slated for demolition. Pl.'s Decl., ¶¶ 2-6 (DE 46). Plaintiff advocated for saving taxpayer funds that were going to be spent on the demolition, and for saving the buildings to serve the children for additional years. *Id.* Plaintiff wrote letters and met with various public officials; addressed the City Council of the City of Boca Raton on two occasions, after which Mayor Abrams wrote to the Superintendent requesting that the demolition be delayed until the charter school proposal can be properly reviewed; was quoted in several newspaper articles covering the demolition; faxed petitions to the Governor signed by community members in favor of BRSC using the buildings; and sent a formal complaint to Florida State officials in response to a survey on concerns regarding charter schools. *Id.*[3] The buildings were ultimately demolished. *Id.* Having been unsuccessful in locating a suitable facility for BRCS, Plaintiff returned from the charter school leave on July 1, 2005 as an adult education assistant principal at Boca Raton Middle School. *Id.*; Pl.'s Answer to Def.'s Interrog. ¶ 2 (DE 49-1).

However, Plaintiff continued her efforts to open BRCS, and took her second charter school leave of absence between February 3, 2006 and June 30, 2008 ("2006 - 2008 leave"). Pl.'s Decl.,

--------------------------------------------------

[3]In the Motion to Strike Portions of Plaintiff's Declaration Under Oath in Opposition to Defendant's Motion for Summary Judgement, Defendant does not object to any factual statements Plaintiff makes based on her personal knowledge. (DE 57). However, Defendant moves to strike quotes from the Defendant's employees and the newspapers as inadmissible hearsay. However, these statements are not hearsay when offered to make a showing that Plaintiff made statements that can be considered critical of the Defendant and the Superintendent while exercising her First Amendment rights, and not to prove the truth of the matters asserted. *See* Fed. R. Evid. 801(c); *Williams v. City of Valdosta*, 689 F.2d 964, 973 n. 5 (11th Cir. 1982)

¶¶ 7-10 (DE 46). During this period of time, Plaintiff served as the Principal, an employee, of BRCS. *Id.*; Pl.'s Answer to Def.'s Interrog. ¶ 17 (DE 49-1). BRCS took over a lease from another school and inherited its students. Pl.'s Decl., ¶¶ 7-10 (DE 46).

Plaintiff alleges that she exercised her First Amendment rights on several occasions during her 2006 - 2008 leave. *Id.* According to the Plaintiff, Defendant unlawfully withheld $72,766 that were due to BRCS. *Id.* Therefore, Plaintiff sent a letter to the School District requesting disbursement. *Id.* Ultimately, the funds were paid to BRCS in April of 2007, or 14 months after they were due. *Id.*

On May 10, 2007 Plaintiff filed an unlawful reprisal complaint with the Florida Department of Education based on the notification from Mark Mitchell, Director of Compensation and Human Resources Planning of the Defendant School Board, that a recommendation was being made to change Plaintiff's contract, if she returned to work, from a three-year administrative to a one-year instructional. *Id.*

During the period of August through October of 2007, Plaintiff spoke out against Superintendent's request for exclusive authority over charter schools in Palm Beach County. *Id.* On August 13, 2007, Plaintiff submitted documentation to the State Department of Education complaining about Defendant School District's abusive treatment of Palm Beach County charter schools, and BRCS in particular. *Id.* On September 18, 2007, Plaintiff testified before the State Board of Education. *Id.* Plaintiff introduced herself as the Principal of BRCS, and spoke about (1) Defendant's withholding of $72,766 from BRCS; (2) Defendant's denial of BRCS' request to use Defendant's facilities; (3) exclusion of charter schools from funds for facilities generated as the result of a referendum; (4) Defendant's discouragement of administrative personnel from taking

4

charter school leave of absence using her personal example, as well as the example of five other former district administrators on charter school leave of absence; (5) denial of opportunity to interview teachers looking for positions at a job fair in Palm Beach County; and (6) access to choice programs publications.[4] State Bd. of Educ. 09/18/07 Meeting Tr., pp. 138-41 (DE 30-3).

On October 16, 2007, Plaintiff again testified before the State Board of Education asking to reject the resolution for Defendant's exclusive authority over charter schools. State Bd. of Educ. 10/16/07 Meeting Tr., pp. 124-25 (DE 30-4). Dr. Johnson was present during both times Plaintiff testified. Pl.'s Decl., ¶¶ 7-10 (DE 46). On October 16, 2007, the State Board of Education voted to deny the request for exclusivity. *Id.*

On November 21, 2007, Plaintiff submitted a letter of complaint to the Florida Department of Education documenting Defendants actions against Plaintiff and her family. *Id.*

Following receipt of information regarding potential non-reappointment of her husband, Mr. Utterback, on May 27, 2009 and June 3, 2009, Plaintiff addressed the Palm Beach County School Board regarding continued retaliation her family has been experiencing. *Id.* at ¶¶ 21. On May 27, 2009, Dr. Johnson recommended Mr. Utterback's non-reappointment. *Id.* However, on June 4, 2011, Mr. Utterback received a revised letter of re-appointment for a one-year contract, as opposed to a three-year that he had held prior. *Id.*

Plaintiff alleges that Defendant, acting through Dr. Johnson, took several adverse actions against her, her family members and BRCS in retaliation for Plaintiff's exercise of her First Amendment rights. Plaintiff's request for BRCS to use Defendant's facilities slated for demolition

---

[4]Only several pages of the transcript were submitted, and Plaintiff's testimony is cutoff at this point.

was denied in April of 2005.[5] Pl.'s Decl., ¶¶ 2-6 (DE 46). On July 5, 2005, Principal Licata berated Plaintiff for her charter school activities. *Id.* at ¶11. Defendant unlawfully withheld $72,766 from BRCS from February 2006 until April 2007. *Id.* at ¶7.

Mr. Mitchell recommended Plaintiff for an annual instructional contract in lieu of a multi-year administrative contract on May 1, 2007. *Id.* at ¶8. However, Plaintiff admits that she did not work as a teacher, did not experience any change in her duties, or pay, or location of her employment. Pl.'s Dep. 17:7 - 19:4 (DE 49-2). In fact, Plaintiff did not have a contract with the Defendant at all during the year she was technically demoted as she was on her leave of absence. *Id.*

Following Dr. Johnson's approval of Plaintiff's application and charter contract on April 12, 2004, Principal Licata "excessed"[6] Che Nash, Plaintiff's son, from his science teaching position at Boca Raton Middle School on May 10, 2004. Pl.'s Decl., ¶ 11 (DE 46). On May 8, 2007, Che Nash was "excessed" again by Principal Licata from Olympic Heights Community High School. *Id.* at ¶¶ 11, 13.

On July 1, 2007, Plaintiff's husband, James Utterback, who was also an employee of the Defendant, was not allowed by the school principal to return from his charter school leave of absence

---

[5] Plaintiff only provided legal support for the proposition that Defendant retaliated when it changed the policy relating to administrative employees' charter school leave of absence thereby allegedly forcing Plaintiff to resign from her position with BRCS. Therefore, it is not clear which particular acts Plaintiff alleges were taken in retaliation for her First Amendment activities. However, being obligated to examine the facts in light most favorable to the Plaintiff, the non-moving party, this Court will consider all possible arguments.

[6] "The term 'excessed' refers to a process whereby teachers—identified based on subject area and seniority—may be transferred to another school based on fluctuations in student population," and being "excessed" is not tantamount to being fired. *Nash v. Palm Beach Co. Sch. Dist.*, 10-14808, 2012 WL 512677, at *2 (11th Cir. Feb. 16, 2012).

to a 12-month administrative position. *Id.* at ¶13; Pl.'s Dep. 16:16 - 17:6 (DE 49-2). Dr. Johnson then recommended Mr. Utterback for a 10-month administrative position on August 1, 2007 after Mr. Utterback had filed an unlawful reprisal complaint with the Florida Department of Education. Pl.'s Decl., ¶ 13 (DE 46).

On February 27, 2008, Dr. Johnson recommended approval of changes to the School District's Charter School Leave Policy 3.80. *Id.* at ¶14. The policy, as amended, required administrators on charter school leave to permanently resign from the School District in order to continue working for the charter school. *Id.* When the amended policy went into effect, if Plaintiff remained in her position as the Principal of a successful charter school, she would have lost her eligibility to return to work for the Defendant and to apply to buy-back Florida Retirement System benefits she did not receive while on the charter school leave of absence. *Id.*

When Plaintiff ultimately returned on July 1, 2008, Defendant assigned her to a position with Royal Palm Beach High School. *Id.* at ¶16. It takes Plaintiff an hour each way to drive there. *Id.* Plaintiff suffers from a medical condition which may result in her passing out, and this condition makes the drive a hardship for her. *Id.* Plaintiff alleges that an identical position became available in Boca Raton, close to Plaintiff's home, on June 13, 2008. *Id.* However, that position was not offered to the Plaintiff. *Id.* Further, when Plaintiff submitted a hardship request on April 9, 2009 requesting to switch positions with an assistant principal of adult education from Boca Raton who wished to be at Royal Palm Beach High School, the request was denied by Dr. Johnson or Guam Sims, the Principal, and Pat Kaupe, Director of Recruitment and Retention. *Id.* at ¶¶ 16-23. However, other administrators had been allowed to switch schools. *Id.*; Johnson Dep. 161:1 - 178:25 (DE 49-7).

Plaintiff alleges that as the result of giving up her position as Principal of BRCS, which she was forced to do due to the Defendant's charter school leave of absence policy change, she lost earnings between $3,352.63 and $38,021.63 for 2008 - 2012, or between $53,680 and $88,349 through her projected retirement at the age of 62. Pl.'s Opposition to Def.'s Mot. for Summary J., p. 11 (DE 47); Pl.'s Decl., ¶ 25 (DE 46). Plaintiff bases this on the fact that her salary with the Defendant is capped, except for uncertain performance pay, whereas she would have received annual 3% raises as a charter school Principal. Pl.'s Decl., ¶ 25 (DE 46). Additionally, Plaintiff's gas expenses for her longer drive to work amount to $23,000 for July 2008 through May 2012. *Id.* Further, Plaintiff had to pay $14,819.37 to the pension plan for contributions Defendant did not make during her leave of absence. *Id.* at ¶ 24.

On May 5, 2009, Kathleen Orloff, Principal of the school where Mr. Utterback worked, informed Mr. Utterback that she was not recommending his reappointment for the next school year, and that he would be terminated from employment with the School District upon expiration of his contract. Pl.'s Decl., ¶ 17 (DE 46); DE 50-1. Mr. Utterback filed a grievance against the School District and a complaint with the Florida Department of Education. Pl.'s Decl., ¶¶ 18, 20 (DE 46). On June 4, 2009, Mr. Utterback received a revised letter of re-appointment for a one-year contract instead of a three-year one he had held previously. *Id.* at ¶ 21. In November of 2010, or 17 months later, Mr. Utterback received his multi-year administrative contract. *Id.*

Plaintiff alleges that in August of 2011 she became aware of an opening of an assistant principal of adult education position at Boca Raton Middle School, a position that she had held previously, but that the position was never posted, and was filled by an employee with no experience in adult education. *Id.* at ¶ 23. Finally, Plaintiff asserts that she suffered emotional damages and

mental anguish as a result of having to give up her position as the Principal of an A-rated charter school and as a result of seeing her family suffer reprisals. *Id.* at ¶ 26.

## DISCUSSION

### I. Summary Judgment Standard

Rule 56 (c) of the Federal Rules of Civil Procedure authorizes summary judgment where the pleadings and supporting materials establish that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The issue for the court is "whether the evidence presents a sufficient disagreement to require submission to a [fact finder] or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the burden of establishing the absence of a genuine issue as to any material fact. *Id.* If the moving party meets its burden, it is up to the non-moving party to proffer "specific facts showing that there is a genuine issue for trial" and that "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *Celotex v. Catrett*, 477 U.S. 317, 324 (1986).

In reviewing the evidence, the court must accept non-moving party's evidence as true and draw all justifiable inferences in favor of the non-moving party. *Anderson*, 477 U.S. at 255. Further, the court must not make credibility determinations or weigh the evidence when considering whether summary judgment is proper. *Id.*

### II First Amendment Retaliation Claim Pursuant to 42 U.S.C. § 1983

Section 1983 of Title 42 states in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be

9

subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .
42 U.S.C. § 1983.

Therefore, to state a claim under section 1983, plaintiff must allege that some person, acting under color of state law, deprived plaintiff of "rights, privileges, or immunities secured by the Constitution and laws." *Blanton v. Griel Mem'l Phsychiatric Hosp.*, 758 F.2d 1540, 1542 (11th Cir. 1985) (quoting 42 U.S.C. § 1983). Municipalities and other local government units are "persons" within the meaning of section 1983. *Monell v. Dep't of Social Serv. of City of New York*, 436 U.S. 658, 690 (1978).

The prong of acting "under color of state law" is not disputed by the parties in this case. However, Plaintiff and Defendant disagree on the issue of deprivation of Constitutional right to free speech and association.

A public employee or a private citizen may bring a claim of retaliation for exercising First Amendment rights. *See Bennett v. Hendrix*, 423 F.3d 1247, 1252-54 (11th Cir. 2005). While public employees do not lose their First Amendment rights by virtue of their employment, they are required to tolerate more than a private citizen before being able to bring a claim of deprivation. *Id.* This is due to the importance afforded to the government's interest as an employer. *See Pickering v. Board of Educ.*, 391 U.S. 563 (1968).

Here, it is undisputed that Plaintiff was on a leave of absence from employment with the Defendant when she engaged in activities allegedly protected by the First Amendment. Therefore, Plaintiff argues that she was not an employee of the Defendant at all, and that *Garcetti v. Ceballos*, 547 U.S. 410 (2006), a case addressing First Amendment rights of public employees, does not apply

10

in this case.

Thus, the threshold question is whether Plaintiff was a public employee for the purposes of bringing a First Amendment retaliation claim. In other words, the Court must consider whether the activities for which Plaintiff was allegedly subjected to Defendant's retaliation are subject to the restrictions applicable to the speech of public employees. In *D'Angelo v. Sch. Bd. of Polk Cnty.*, 497 F.3d 1203, 1210 (11th Cir. 2007), the Eleventh Circuit determined that whether the employee was speaking pursuant to an official duty, and whether employee's speech was on a matter of public interest are questions of law. It follows that the threshold inquiry here is likewise a question of law.

### A. Free Speech claim

Plaintiff alleges that Defendant violated her rights to free speech and association. (DE 1). The Court will analyze Plaintiff's claim based on an alleged violation of her right to free speech first.

### 1. Plaintiff was protected by the First Amendment to the same extent as public employees

The Supreme Court stated that the "government needs to be free to terminate both employees and contractors for poor performance, to improve the efficiency, efficacy, and responsiveness of service to the public, and to prevent the appearance of corruption." *Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 674 (1996). The Supreme Court held that government contractors were protected by the First Amendment to the same extent as government employees. *See id.* at 680-85. According to the Supreme Court, independent contractors were situated between government employees, who have the closest relationship with the government, and those with less close relationships, such as claimants for tax exemption and recipients of government subsidies. *Id.* The Court found no reason to deny independent contractors constitutional protection against retaliation, and no "difference of constitutional magnitude" between contractors and

employees. *Id.* At the same time, the Supreme Court found that the balancing test of weighing employee's constitutional rights against the interest of the government as an employer mandated by *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968) could adequately account for and protect both interests. *Id.*

In *Marez v. Bassett*, 595 F.3d 1068 (9th Cir. 2010), the Ninth Circuit had to determine whether plaintiff was "employed" by the defendant city for the purposes of the First Amendment retaliation claim. The Ninth Circuit concluded that because plaintiff's role did not entail the usual hallmarks of employment, such as receiving pay or ability to exercise any official power, he was not an employee. *Marez v. Bassett*, 595 F.3d 1068, 1075 (9th Cir. 2010). Likewise, the city had little interest in controlling plaintiff speech because, as a member of the city's small business advisory committee, he was an outsider tasked with voicing concerns raised by private citizens. *Id.* Therefore, application of *Garcetti v. Ceballos*, 547 U.S. 410 (2006) was not required.

In contrast, the Eleventh Circuit found that the principal of a charter school was protected by the First Amendment against retaliation by the school board to the same extent as public employees, and that *Umbehr* and *Garcetti* applied. *White v. Sch. Bd. of Hillsborough Cnty.*, 08-10922, 2009 WL 174944, at *3 (11th Cir. Jan. 27, 2009).[7]

Florida Charter Schools statute, Fla. Stat. § 1002.33, specifies that "[i]ndividuals or groups of individuals who contract their services to the charter school are not public employees." Fla. Stat. § 1002.33(12)(i); *White v. Sch. Bd. of Hillsborough Cnty.*, 8:06-CV-1626-T-27MAP, 2008 WL 227990, at *3 (M.D. Fla. Jan. 25, 2008) (aff'd *White v. Sch. Bd. of Hillsborough Cnty.*, 08-10922,

---

[7] In the Eleventh Circuit, unpublished opinions are not binding precedent but may be cited as persuasive authority. U.S. Ct. of App. 11th Cir., Rule 36-2.

2009 WL 174944 (11th Cir. Jan. 27, 2009)). However, the district court in *White* found that principal of a charter school who was the signatory to the contract between the school board and the charter school was in a position similar to a government contractor under *Umbehr*, and subject to the protection of the First Amendment to the same extent as public employees. *See White v. Sch. Bd. of Hillsborough Cnty.*, 2008 WL 227990, at *3 (M.D. Fla. Jan. 25, 2008). In the opinion upholding the district court's decision, the Eleventh Circuit stated that in Florida charter schools are public schools that are subject to significant oversight by the sponsoring school district. *Id.* (citing Fla. Stat. §1002.33). Therefore, the Eleventh Circuit held that *Umbehr* applied because the school board was entitled to deference in its decision to terminate the charter in that case. *Id.*

Here, Plaintiff argues that she was not an employee of the Defendant School Board because she was on an unpaid leave of absence when she engaged in her First Amendment activities. However, Plaintiff states in her Declaration Under Oath that "I worked with the Charter Department of the Defendant between October 16, 2003 and April, 2004 to negotiate the charter contract and it was approved on or about April 12, 2004." Pl.'s Decl. ¶ 2 (DE 46). Therefore, Plaintiff was in the same position as the plaintiff in *White*.

Similarly to the plaintiff in *Marez v. Bassett*, 595 F.3d 1068 (9th Cir. 2010), Plaintiff here was not paid by the Defendant and had no ability to exercise any official authority while on leave. However, Plaintiff was not an outsider to the same degree as the plaintiff in *Marez*.

For example, Plaintiff here states that "[s]tate law prohibits reprisal for employees of public schools who take an approved Charter School leave; accordingly, on May 10, 2007 I filed an Unlawful Reprisal complaint with the Florida Department of Education pursuant to F.S. 1002.33(4), against the Superintendent, Johnson and Mr. Johnson who had, without proper legal authority to do

13

so, signed the letter purporting to demote me from an administrator position to an instructional position." Pl.'s Decl. ¶ 9 (DE 46). Plaintiff filed this complaint while on her unpaid leave of absence from employment with the Defendant. Therefore, Plaintiff herself believed she was an employee. While this belief is not dispositive, it reinforces the conclusion that there was no "difference of constitutional magnitude" between Plaintiff's status and Defendant's other public employees. *See Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 684 (1996) (internal quotation omitted). Therefore, Plaintiff is protected by the First Amendment to the same degree as public employees. *See id.*; *White v. Sch. Bd. of Hillsborough Cnty.*, 08-10922, 2009 WL 174944 (11th Cir. Jan. 27, 2009).

### 2. Public employee's claim of retaliation for exercising rights to free speech under the First Amendment

To establish a claim of retaliation for exercise of First Amendment rights to free speech, a public employee must first show that she spoke as a citizen, and not pursuant to her duty as an employee. *D'Angelo v. Sch. Bd. of Polk Cnty.*, 497 F.3d 1203, 1209 (11th Cir. 2007) (citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006)). Additionally, public employee's speech must be on a matter of public concern. *Id.* These are questions of law. *Id.* at 1210. If plaintiff succeeds, the court must weigh the employee's First Amendment interests against the interest of the state, as an employer, in promoting efficiency of the public services it performs through its employees. *Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)).

If the employee prevails on the balancing test, the fact-finder determines whether the employee's speech played a substantial part in the government's decision to take an adverse action against the employee. *Id.* Finally, the government may still prevail if it proves by the preponderance of the evidence that it would have taken the same action in the absence of the protected conduct. *Id.*

### a. Majority of Plaintiff's statements were made as a citizen and not pursuant to her official duties

When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for the purposes of the First Amendment. *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) (finding that memoranda to the deputy district attorney's supervisor on the inaccuracies contained in an affidavit was not entitled to the protection of the First Amendment). Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. *Id.* at 421-22. Therefore, employer's control over such speech is justified. *Id.*

The practical inquiry into whether an employee's official duties gave rise to the speech in question must include examination of the "content, form, and context of a given statement, as revealed by the whole record." *Abdur-Rahman v. Walker*, 567 F.3d 1278, 1283 (11th Cir. 2009) (internal quotations omitted). Formal job descriptions do not control. *Id.* The issue is whether the employee was speaking pursuant to an official duty, not whether that duty was part of the employee's everyday job functions. *Id.* (quoting *Battle v. Bd. of Regents for Georgia*, 468 F.3d 755, 757-59 (11th Cir. 2006)).

In *White*, the Eleventh Circuit upheld district court's finding that charter school principal's letter requesting that the school board waive certification requirement for a vocational teacher and a letter alleging that the fire inspector filed a false report on the school were made pursuant to the principal's official duties to the charter school. *White v. Sch. Bd. of Hillsborough Cnty.*, 08-10922, 2009 WL 174944, at \*3 (11th Cir. Jan. 27, 2009). The letters were sent to the school board and to the board members of the charter school. *Id.*

Here, Plaintiff was on an unpaid leave of absence when she engaged in allegedly protected

15

activities. Therefore, Plaintiff argues that she had no official duties to the Defendant, and, therefore, spoke as a citizen. However, the principal in *White* was only entitled to somewhat limited protection of the First Amendment as a government contractor because of her duties to the charter school. Therefore, the relevant inquiry in this case is whether Plaintiff spoke pursuant to her duties to BRCS.

During 2004-2005, Plaintiff advocated for continual use of public school buildings slated for demolition to save taxpayer funds and to allow additional utilization of the facilities. Plaintiff wrote letters and met with the School Board employees and Board members, Florida Attorney General, the Governor, and officials at the Florida State Board of Education. She addressed the City Council of Boca Raton and enlisted the Mayor's support. Plaintiff also faxed a petition to the Governor signed by community members.

Plaintiff wanted BRCS to be able to use the buildings, and may have had a responsibility to find suitable premises to open BRCS. Therefore, the content of her speech may have found its origin in Plaintiff's duty to BRCS. However, the context and form of her activities were those of a citizen's speech. There is a relevant analogue to this kind of speech that a citizen can make. *See Garcetti*, 547 U.S. at 423-24. Therefore, Plaintiff spoke as a citizen.

During the 2006-2008 leave, Plaintiff served as the Principal, a paid employee of BRCS. She complained to the School District that $72,766 was overdue to BRCS. This is an administrative task, similar to the ones the principal undertook in *White*, and was performed because of Plaintiff's duty to BRCS. The fact that Plaintiff was the Principal of BRCS, and not a person in charge of the school's finances is not dispositive. Therefore, Plaintiff did not speak as a citizen when she wrote to the School Board about the underpayment. Consequently, the Court will not consider this speech any further. *See Kurtz v. Vickrey*, 855 F.2d 723, 732 (11th Cir. 1988) (it is reasonable for the district

16

court to separate instances of speech into protected and unprotected categories when "speech" consists of many different statements, memoranda and letters published over several years).

On May 10, 2007, Plaintiff also filed a reprisal complaint with the Florida Department of Education arguing that changing her contract from a multi-year administrative to an annual instructional would be unlawful; and submitted a letter to the Department documenting Defendant's actions against the Plaintiff and her family on November 21, 2007. Plaintiff would not have a duty to either BRCS or the Defendant to file such complaints. Likewise, Plaintiff would not have a duty to address the School Board regarding alleged retaliation her family has been experiencing, as Plaintiff did in May and early June of 2009. Therefore, she did not speak pursuant to her official responsibilities.

Plaintiff spoke as a citizen when she submitted documentation to the State Department of Education, and addressed the State Board of Education during two hearings on the issue of Defendant's treatment of charter schools in Palm Beach County. Plaintiff complained again about underpayment of $72,766 and denial of use of J.C. Mitchell buildings to BRCS. However, Plaintiff also spoke about exclusion of charter schools from funds for facilities generated as the result of a referendum and lack of adequate access for charter schools to choice programs publications. These are concerns relevant not just to BRCS, but to the charter schools in general. Again, it was in the best interest of BRCS to notify the state officials of the treatment it was experiencing. Therefore, the content of the speech found its origin in Plaintiff's duties to her charter school. However, Plaintiff's speech was broader than any duty she had to BRCS because she lobbied not only on its behalf. A concerned citizen would take analogous steps. Therefore, the context and form of Plaintiff's speech indicate that Plaintiff did not speak pursuant to her official duties when she

17

submitted documentation to the State Department of Education and addressed the State Board of Education during two hearings on the issue of Defendant's treatment of charter schools in Palm Beach County.

**b. Majority of Plaintiff's speech was on issues of public concern**

Whether public employee's or contractor's speech addresses a matter of public concern depends on whether the speech can be fairly considered as relating to any matter of political, social, or other concern to the community. *Connick v. Myers*, 461 U.S. 138, 146 (1983). The content, form, and context revealed by the records as a whole determines whether the speech in question addresses a matter of public concern. *Id.* at 148.

The relevant inquiry is not whether the public would be interested in the topic of the speech but whether the purpose of plaintiff's speech was to raise issues of public concern. *Boyce v. Andrew*, 510 F.3d 1333, 1344 (11th Cir. 2007) (internal quotations omitted). A "public employee may not transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run." *Ferrara v. Mills*, 781 F.2d 1508, 1516 (11th Cir. 1986). Comments made in private are protected by the First Amendment to the same degree as speech made publicly. *Id.* at 1516, n. 11. While the fact that the employee attempted to communicate his or concerns to the public is not dispositive, it is relevant to the determination whether the employee's speech relates to a matter of public concern. *Kurtz v. Vickrey*, 855 F.2d 723, 727 (11th Cir. 1988).

The fact that both private and public concerns are present is likewise not dispositive. *See Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir. 1993). Because an employee's speech will rarely be entirely public or entirely private, the court must consider whether the speech was motivated

primarily by private or public interests. *See id.*; *Rodin v. City of Coral Springs, Florida*, 229 Fed. App'x. 849, 853-56 (11th Cir. 2007). Representative character of the speech is a significant factor in determining whether public or private concerns predominated. *See Rodin v. City of Coral Springs, Florida*, 229 Fed. App'x. at 853-56.

Speech criticizing public institution's funding decisions is speech on a matter of public concern. *Id.* (citing *Kurtz v. Vickrey*, 855 F.2d 723, 729-30 (11th Cir. 1988)). In *Rodin*, the Eleventh Circuit found that a volunteer firefighter's speech criticizing the city's fire chief's spending decisions as wasteful was on a matter of public concern. *Id.* The comments in question where made at a meeting with public officials, which plaintiff attended on behalf of the Coral Springs Volunteer Firefighters Association when plaintiff served as the president of that organization. *Id.* at 850. The Court found that the speech was pertinent to then-ongoing public debate, which plaintiff had a chance to influence by bringing his concerns to the officials' attention. *Id.* at 854. The court also considered that plaintiff spoke on behalf of other firefighters and that he was a volunteer with no way of benefitting personally if the city was to agree with him. *Id.*

Here, Plaintiff addressed various public officials during her 2004 - 2005 leave and advocated continuous use of the buildings of the J.C. Mitchell school as opposed to demolishing them. Plaintiff advocated that BRCS, a school which she started, should use the buildings. Therefore, she was definitely motivated in a significant degree by private interests. However, this fact is not conclusive.

A factor weighing in favor of finding that Plaintiff spoke on the issues of public concern is that she made her concerns public. Also, at the time Plaintiff engaged in her allegedly protected speech, there was an ongoing public discourse regarding the demolition as evidenced by the newspaper coverage. (DE 49-4, pp. 100-101). Therefore, context and form of Plaintiff's comments

were public in nature.

For example, the Mayor of Boca Raton wrote to the Superintendent requesting that the J.C. Mitchell school building not be demolished until the charter school proposal is properly reviewed.[8] Letter from Steven Abrams to Dr. Johnson (DE 49-4, p.1). The Mayor wanted to "ensure that the educational needs of the children of our City are being properly met, and that public funds are being properly used." Id. The Mayor was motivated by public concerns as there is no evidence that he had any private interest in this matter. Thus, the record shows that Plaintiff was not airing a personal grievance and was not aiming only to benefit personally or as the principal of the school she founded, but that the primary purpose of her speech was to raise issues of public concern and that she spoke as a citizen.

Plaintiff's complaints to the Florida Department of Education in May and November of 2007 were classic employee grievances motivated by private interest. The same is true of Plaintiff's addresses to the School Board in May and June of 2009 regarding the retaliation her family had been experiencing. Therefore, the Court will not consider this speech any further in the analysis. See

---

[8]Defendant makes general objections that Plaintiff relies on exhibits which have not been authenticated, and which contain inadmissible hearsay. (DE 56). To the extent these objections refer to the letter from Mayor Steven Abrams to the Superintendent (DE 49-4, p.1), the objections are overruled.

To authenticate an item of evidence, the proponent must only produce "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a); United States v. Hanna, 191 Fed. App'x 921, 924 (11th Cir. 2006). Here, Plaintiff stated in her Declaration Under Oath that on May 11, 2005, Mayor Abrams wrote to the Superintendent requesting that the demolition be postponed until the charter school proposal can be properly considered. Pl.'s Decl. ¶ 4 (DE 46). This is evidence sufficient to support a finding that the letter is what Plaintiff claims it is.

To the extent Defendant argues that the letter is hearsay, the Court will not consider it for the truth of the matters asserted in the letter, but only as evidence of the Mayor's efforts. See Mack v. Augusta-Richmond Cnty., Ga., 365 F. Supp. 2d 1362, 1372 (11th Cir. 2005).

20

*Kurtz v. Vickrey*, 855 F.2d 723, 732 (11th Cir. 1988) (it is reasonable for the district court to separate instances of speech into protected and unprotected categories when "speech" consists of many different statements, memoranda and letters published over several years).

Plaintiff's submission of documentation to the State Department of Education complaining about Defendant School District's abusive treatment of Palm Beach County charter school and BRCS, and Plaintiff's comments at the September 18, 2007 and October 16, 2007 meetings of the State Board of Education were motivated primarily by public concerns. Again, Plaintiff did have a personal interest in the subject matter. However, like the plaintiff in *Rodin*, Plaintiff spoke not only on behalf of BRCS, but also on behalf of other Palm Beach County charter schools. Also, Plaintiff made her concerns public. Therefore, Plaintiff spoke as a citizen on matters of public concern in these instances.

### c. Defendant's interest does not outweigh Plaintiff's First Amendment rights

The Court is now required to balance Defendant School Board's interest as an employer or a party to the government contract to regulate Plaintiff's speech against Plaintiff's constitutional right to comment on matters of public interest. *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Boyce v. Andrew*, 510 F.3d 1333, 1343 (11th Cir. 2007). In *Umbehr*, the Supreme Court stated that the *Pickering* balancing test takes into account various interests and can accommodate any pertinent differences between government employees and government contractors. *See Bd. of Cnty. Comm'rs, Wabaunsee Cnty., Kan. v. Umbehr*, 518 U.S. 668, 678 (1996).

The *Pickering* balancing test requires "full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick v. Myers*, 461 U.S. 138, 151 (1983). The government's judgment deserves a high degree of deference when close

21

working relationships are essential to fulfillment of public responsibilities and when plaintiff's actions interfered with those working relationships. *Id.* at 152. The more substantially the employee's speech involved matters of public concern, the stronger showing is required from the government. *Id.*

Other factors to be considered include manner, time, place, and context of the speech. *Id.* at 152-53. For example, speech which transpires on employee's own time and not in the work area may warrant less deference to the government. *See id.* at 153, n. 13. However, when an announced office policy is violated the government's position is stronger. *See id.* at 153. Likewise, when the speech arose in the context of a dispute over application of a policy, additional weight must be given to the government's position. *Id.* The court may consider the function of the employer, employee's position in the office, and the nature of the statement when engaging in the balancing analysis under *Pickering. See Rankin v. McPherson*, 483 U.S. 378, 392 (1987).

For example, the employer need not tolerate an "embarrassing, vulgar, vituperative, ad hominem attack" that impairs discipline by superiors or harmony among coworkers. *Morris v. Crow*, 117 F.3d 449, 458 (11th Cir. 1997) (government's interest outweighed employee's right to free speech where the manner in which the employee expressed her message was disrespectful and rude). However, when the employee speaks in a non-disruptive fashion and does not jeopardize any of the government's legitimate interests in performing its functions, the employee's rights prevail. *Belyeu v. Coosa Cnty. Bd. of Educ.*, 998 F.2d 925, 929-30 (11th Cir. 1993). In *Belyeu*, the Eleventh Circuit found that a teacher's aid's speech at a PTA meeting about the school's failure to have a program or a commemoration for Black History Month conducted in a polite manner did not disrupt racial harmony at the school. *Id.* at 928-29. Therefore, the school's interest in reducing racial

animosity did not outweigh the employee's right to free speech. *Id.*

As discussed earlier, Plaintiff's First Amendment rights were protected to the same extent as those of public employees because she was in a role similar to that of a government contractor, and the government has an interest in regulating its contractors. Therefore, Defendant's interest in regulating Plaintiff's speech stems from Defendant's interest or obligation in regulating charter schools. *See White v. Sch. Bd. of Hillsborough Cnty.*, 08-10922, 2009 WL 174944, at *3 (11th Cir. Jan. 27, 2009).

Section 1002.33 of the Florida Statutes establishes a comprehensive scheme for all aspects of the creation, operation, and termination of charter schools. *Sch. Bd. of Palm Beach Cnty. v. Survivors Charter Schools, Inc.*, 3 So.3d 1220 1229 (Fla. 2009). Under the statute, a district school board or a state university may sponsor a charter school. Fla. Stat. § 1002.33(5). The sponsor's duties are to monitor and review the charter school in its progress toward the goals established in the charter; to monitor the revenues and expenditures of the charter school; to ensure that the charter school is innovative and consistent with the state education goals; report the charter school to the Department of Education if the school falls short of performance measures included in the approved charter. *Id.* The statue also empowers the sponsor to terminate the charter when health, safety, or welfare of the students is threatened or where other good cause exists. *Sch. Bd. of Palm Beach Cnty. v. Survivors Charter Sch., Inc.*, 3 So.3d 1220, 1236 (Fla. 2009) (considering procedures for immediate termination of a school charter but not deciding whether good cause for termination existed due to financial mismanagement of the charter school).

Here, during her 2004-2005 leave, Plaintiff engaged in speech advocating allowing BRCS to use the buildings of J.C. Mitchell school. At the time, Defendant approved Plaintiff's elementary

23

charter school application and the charter contract, but BRCS was not in operation, had no students, and Plaintiff was an unpaid volunteer for BRCS. Thus, Plaintiff's conduct had little bearing on Defendant's interest in the effective and efficient fulfillment of its responsibilities to the public. Namely, because BRCS was not in operation, students' welfare was not at issue and neither were most of the other aspects of Defendant's interests in regulating BRCS. Therefore, while Defendant still had an interest in being able to terminate the charter contract, as was the case in *Umbehr* and *White*, it never articulated a need to do so, and it appears that Defendant's interest was minimal at this point. Further, Plaintiff did not speak in an offensive manner, did not cause any disruption, and the public does have an interest in how public funds are expended and how charter schools are treated by the School Board.

During Plaintiff's 2006 - 2008 leave, BRCS was in operation. Thus, Defendant had a stronger interest in regulating BRCS and, thereby, the Plaintiff. However, Plaintiff engaged in speech in a manner and context that had little bearing on Defendant's ability to efficiently perform its duties under the charter school statute or to efficiently deliver its services to the public. There is no indication in the record that Plaintiff's speech was disruptive in any way. Plaintiff was not rude or disrespectful, and her speech did not occur on school premises.

Plaintiff was a Principal of a public charter school. Thus, in contrast to the plaintiff in *Belyeu*, a teacher's aid, Plaintiff held a relevantly high position within the School District. This may strengthen Defendant's argument that it had an interest in regulating Plaintiff's speech. However, this is buttressed by the fact that Florida Statutes consider charter schools competitors to regular public schools. *See* Fla. Stat. § 1002.33(2)(b) (stating that some of the statutory purposes charter schools may fulfill are to "[p]rovide rigorous competition within the public school district to

24

stimulate continual improvement in all public schools," and to "[c]reate new professional opportunities for teachers, including ownership of the learning program at the school site."). This, in turn, diminishes Defendant's interest in regulating Plaintiff's speech. In sum, Defendant's interest in efficiently performing its duties did not outweigh Plaintiff's right to speak on a matter of public concern.

### d. Defendant took adverse actions directed at the Plaintiff

Plaintiff alleges that Defendant retaliated and took adverse actions against her, her husband, her son, and the charter school she founded, BRCS. In particular, BRCS was denied an opportunity to use the buildings of the J.C. Mitchell school, which were slated for demolition but were still relatively new. Also, Defendant unlawfully withheld $72,766 from BRCS for over a year. Dr. Johnson acknowledged that the funds were withheld due to a misunderstanding by the Defendant. Johnson's Dep. 140:8 - 140:15 (DE 30-8). Not having access to the funds caused BRCS to be publicized as being on a financial recovery plan, which, in turn, caused BRCS to lose students. Pl.'s Decl. ¶ 7 (DE 46).

Mr. Utterback, Plaintiff's husband was not allowed to return from his charter school leave of absence in July of 2007 to a 12-month contract that he had held. Following a reprisal complaint, Dr. Johnson recommended Mr. Utterback for a 10-month contract. Then, in May of 2009, Principal Orloff informed Mr. Utterback that she was not going to recommend his reappointment, which would have caused Mr. Utterback's employment being terminated. Following filing of a grievance and of a complaint for unlawful reprisal, and Plaintiff's public comments at a School Board meeting, Mr. Utterback was reappointed for one year, and only received his multi-year contract in November of 2010. Mr. Nash, Plaintiff's son, was excessed by Principal Licata in May of 2004, and then again

in May of 2007.

Plaintiff herself was demoted in May of 2007 while on leave. Then, Defendant's change of charter school leave of absence relating to administrators caused Plaintiff to choose between losing her eligibility to come back to work for the Defendant or losing an opportunity to run BRCS. When Plaintiff chose to return to Defendant's employ, Defendant withheld from Plaintiff an assistant principal of adult education position in Boca Raton, which was close to Plaintiff's home. Afterwards, Defendant denied Plaintiff's and another assistant principal's request to switch schools so that each could be closer to home while the same relief was afforded other administrators. Finally, Defendant did not post and withheld from Plaintiff another assistant principal of adult education position in Boca Raton, and filled it with a person with no experience in adult education.

Defendant challenges Plaintiff's standing to bring the claim for injuries not suffered by her. Defendant asserts that Mr. Utterback and Mr. Nash are capable of raising their own claims. In fact, Mr. Nash did sue the School Board alleging that he was excessed wrongfully, and was not successful. *See Nash v. Palm Beach Co. Sch. Dist.*, 10-14808, 2012 WL 512677 (11th Cir. Feb. 16, 2012). Therefore, the threshold question is whether Plaintiff has standing to assert that Defendant retaliated against her through her family members and through adverse actions directed at BRCS.

### i. Plaintiff has standing to assert retaliation based on alleged adverse actions taken against her family members and BRCS

Claims of retaliation by the government for exercise of constitutional rights depend not on the denial of a constitutional right, but on the harassment plaintiff received for exercising the right. *See Bennett v. Hendrix*, 423 F.3d 1247, 1252-54 (11th Cir. 2005) (addressing retaliation claims of private citizens). "The reason why such retaliation offends the Constitution is that it threatens to inhibit exercise of a protected right." *Id.* (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir.

1999)). The Supreme Court has found that a constitutional violation may arise from the "chilling" effect of governmental regulations that do not directly prohibit exercise of First Amendment rights. *Laird v. Tatum*, 408 U.S. 1, 11 (1972) (collecting cases).

Further, in the context of employment statutes, the courts have been liberal and plaintiff-friendly in interpreting anti-retaliation provisions.[9] *See Thompson v. North Am. Stainless, LP*, 131 S.Ct. 863 (2011) (finding that plaintiff who was allegedly fired in retaliation for his fiancee's protected activity was protected by Title VII anti-retaliation provision, the purpose of which is to protect employees from their employer's unlawful actions); *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-70 (2006) (finding that the scope of Title VII anti-retaliation provisions extends beyond workplace-related or employment-related retaliatory acts and harm); *N.L.R.B. v. Advertizers Mfg. Co.*, 823 F.2d 1086 (7th Cir. 1986) ("To retaliate against a man by hurting a member of his family is an ancient method of revenge and is not unknown in the field of labor relations"); *Kenrich Petrochemicals, Inc. v. N.L.R.B.*, 907 F.2d 400, 410 (1990) (same); *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 568-69 (3rd Cir. 2002) (finding that alleged retaliation for plaintiff's father's activity was actionable under the ADA, which prohibits employers from interfering with the employees' exercise of their rights under the Act).

Here, if, in fact, Defendant retaliated not only against the Plaintiff, but also against her family members, such retaliation would threaten to inhibit Plaintiff's exercise of her First Amendment rights. While BRCS is in a different position than Plaintiff's family, Plaintiff has established that

---

[9]The Eleventh Circuit noted that the standards for the adverse employment action requirement for First Amendment retaliation and Title VII retaliation claims are consonant, and that it relies on Title VII cases to inform its analysis of First Amendment retaliation claims. *Akins v. Fulton Cnty., Ga.*, 420 F.3d 1293, 1301 n. 2 (11th Cir. 2005).

she devoted several years of her life to creating and running BRCS as its Principal, and that this charter school was very important to her. Thus, adverse actions against BRCS could have a chilling effect on Plaintiff's desire to exercise her rights to free speech. Therefore, Plaintiff has alleged an injury sufficient to confer standing in alleged harm that Defendant caused to her family members and BRCS.

Contrary to Defendant's argument, the fact that Plaintiff's husband and son are capable of vindicating their own rights does not change this outcome because it is possible for several plaintiffs to have standing to bring claims based on the same adverse action. *See Shankle v. Bell*, 2:04cv1885, 2006 WL 2794559, at *4 (W.D. Pa. Sept. 27, 2006) (finding that a citizen had standing to bring a First Amendment retaliation claim for the state police officials' disciplinary action against her husband, a state trooper, but granting summary judgment against the husband based on the same adverse employment action because he did not engage in a protected activity).[10]

### ii. Plaintiff created a genuine issue of material fact as to the element of adverse employment action

The Eleventh Circuit has held that to be considered an "adverse employment action in a First Amendment retaliation case, the complained-of action must involve an important condition of employment." *Akins v. Fulton Cnty., Ga.*, 420 F.3d 1293, 1300 (11th Cir. 2005) (quoting *Stavropoulos v. Firestone*, 361 F.3d 610, 619 (11th Cir. 2004)). An adverse employment action

---

[10]Defendant's position is that because Mr. Nash already had attempted to vindicate his rights for being excessed wrongly in his view, was unsuccessful and did not primarily base his claims of retaliation on his mother's conduct, Plaintiff should not be able to rely on actions Defendant took against Mr. Nash. While Mr. Nash may be prevented by *res judicata* from making a claim that he was excessed due to his mother's activities, there is no authority stating that this would bar Plaintiff from relying on these facts to prove her case according to her legal theory.

exists when the "alleged employment action would chill the exercise of constitutionally protected speech." *Id.* Important conditions of employment include discharges, demotions, refusals to hire or promote, and reprimands. *Id.* Additionally, any other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives the employee of employment opportunities, or adversely affects plaintiff's status as an employee, likewise represents an adverse employment action. *Id.* Further, the list of examples of adverse employment actions can be expanded if the action impacts an important condition of employment. *Id.* Lastly, the total weight of employer's actions, which may not qualify when considered individually, can constitute an adverse employment action. *Id.* (citing *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 716 (11th Cir. 2002)).

Recently, in a retaliation case under Title VII, the Supreme Court held that the "scope of antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-70 (2006). The Eleventh Circuit recognized that this newly-relaxed standard overruled the portion of its decision in *Stavropoulos v. Firestone*, 361 F.3d 610 (11th Cir. 2004), which had required an "ultimate employment decision" or "substantial employment action" under Title VII. *Crawford v. Carroll*, 529 F.3d 961, 973-74 (11th Cir. 2008) (finding that plaintiff, an employee of a state university, suffered an adverse employment action under Title VII when she received a negative performance appraisal, which deprived her of an opportunity to receive a merit pay increase, despite the fact that the university retroactively awarded the increase, because employers cannot undo the harm and avoid liability simply by attempting to make the employee whole retroactively).

It is not settled whether *Burlington* overruled the Eleventh Circuit's "important condition of

employment" standard for retaliation claims under the First Amendment, which was established by *Stavropoulos* and *Akins*. Several Circuits either adopted the *Burlington* standard in First Amendment retaliation cases, or have been using similar standards. *Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon Cnty.*, 587 F.3d 1223, 1237-38 (10th Cir. 2009) (collecting cases from the Seventh, Second, and Sixth Circuits, contrasting them with *Akins*, and electing to consider whether the employer's specific action would deter a reasonable person from exercising his First Amendment rights); *but see DePree v. Saunders*, 588 F.3d 282, 288 (5th Cir. 2009) (finding no clearly established law for the purposes of qualified immunity because "this court has not normally applied *Burlington* to First Amendment retaliation claims"). The Eleventh Circuit noted that the standards for the adverse employment action requirement for the First Amendment and Title VII retaliation claims are consonant and relies on Title VII and First Amendment retaliation cases interchangeably. *Akins v. Fulton Cnty., Ga.*, 420 F.3d 1293, 1301 n. 2 (11th Cir. 2005). Therefore, the *Burlington* standard applies to this case. *See Tatroe v. Cobb Cnty., Ga.*, 1:04-CV-1074-WSD, 2008 WL 361010 at *6 (N.D. Ga. Feb. 8, 2008). This will also be in accord with the Eleventh Circuit's standard for private citizens alleging retaliation for exercising First Amendment rights. *See Bennett v. Hendrix*, 423 F.3d 1247, 1252-54 (11th Cir. 2005). That standard states that a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights. *Id.*

Thus, Plaintiff must show that a reasonable employee would have found the challenged action materially adverse, or that such action might have dissuaded a reasonable worker from engaging in protected conduct or assisting another in doing so. *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68-70 (2006). The complained-of action cannot be a trivial harm, a petty

slight or a minor annoyance. *Id.* For example, a supervisor's refusal to invite an employee to lunch is normally a trivial non-actionable slight, but excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement may deter a reasonable worker from engaging in protected conduct. *Id.* While the standard is objective, context is important. *Id.* Many workers may not consider a schedule change to be significant, but such a change may matter tremendously to a young mother with school-age children. *Id.*

Here, Plaintiff alleges that BRCS was not allowed to use J.C. Mitchell school buildings, which had been slated for demolition, even though state law allowed such use. Plaintiff next argues that Defendant withheld $72,766 from BRCS for approximately fourteen months between February, 2006 and April, 2007 due to a misunderstanding by the Defendant, and not having access to the funds caused BRCS harm. In particular, BRCS was publicized as being on a financial recovery plan, which caused it to lose enrollment. The question is whether a reasonable employee would consider these to be materially adverse actions that would dissuade her from engaging in protected conduct. In light of the fact that adverse actions in combination may chill Plaintiff's desire to engage in protected conduct, the Court cannot conclude that these actions do not qualify as adverse employment actions as a matter of law.

Plaintiff further asserts that in 2007 and 2009 Mr. Utterback was only reappointed to the contracts equivalent to the ones he had held in the past after having to file reprisal complaints and having to hire representation in at least one instance. Pl.'s Decl. ¶ 18 (DE 46). This happened despite Mr. Utterback always having good performance evaluations. *Id.* at ¶ 21. In *Rutan v. Republican Party of Illinois*, the Supreme Court has found that failure to rehire an employee after a temporary layoff will violate the First Amendment if the decision not to rehire was made because

of the employee's exercise of his or her constitutional rights. 497 U.S. 62, 74 (1990). Coupled with the understanding that employers cannot escape liability by retroactively making employees whole, this leads the Court to conclude that it is not appropriate to state that Defendant's actions do not qualify as adverse employment actions as a matter of law.

Plaintiff alleges that Defendant retaliated against her by taking adverse actions against her son by "excessing" him wrongly. Defendant argues that Mr. Nash's claims have already been adjudicated, and, save for a stray remark at a deposition, Mr. Nash did not allege that Defendant's conduct against him was due to his mother's protected activities. However, while the district court expressed doubt that lateral transfers that Mr. Nash experienced constituted adverse employment action under *Burlington*, the court assumed that Mr. Nash established adverse employment action, and denied his retaliation claim pursuant to 42 U.S.C. § 1981 because his mother's activities were not protected and due to lack of connection between Mr. Nash's filing of an EEOC complaint and his transfer. *Nash v. Palm Beach Cnty. Sch. Dist.*, 08-80970-CIV, 2010 WL 3220191, at *10-11 (S.D. Fla. Aug. 13, 2010). Mr. Nash did not challenge these findings on appeal. *Nash v. Palm Beach Cnty. Sch. Dist.*, 10-14808, 2012 WL 512677, at *2 (11th Cir. Feb. 16, 2012). Therefore, it has not been determined that Defendant's conduct towards Mr. Nash did not constitute an adverse employment action. If Plaintiff can show that Defendant's actions towards her son were taken because of her protected conduct, a reasonable jury can find in favor of the Plaintiff, and summary judgment, therefore, is not appropriate on this issue.

In May of 2007, Plaintiff was demoted for a year to an instructional position on a one-year contract, as opposed to a multi-year one she had held previously. Plaintiff admitted that this Defendant's action did not result in changes to her pay, responsibilities, or location of her

32

employment. In fact, she was on leave and employed by BRCS at the time. Therefore, a reasonable employee would not likely be deterred from exercising her constitutional rights because of this type of demotion. However, while this action by itself may not rise to the level of adverse employment action, when it is considered in combination with the other actions, the total weight of the alleged conduct may deter a reasonable employee from engaging in protected speech.

Plaintiff also alleges that Defendant changed its charter school leave policy for administrators forcing her to either resign her employment with the Defendant losing some of her retirement benefits, or to resign her position with BRCS. If Plaintiff can show that the policy change was because of her protected conduct, a reasonable employee could be dissuaded from engaging in protected speech, and a jury could find in her favor.

Finally, Plaintiff alleges that Defendant did not post and withheld from her assistant principal of adult education positions in Boca Raton in 2008 and 2011, and denied her an opportunity to switch schools with another administrator. Plaintiff, thus, is forced to drive over an hour in each direction to her present school, which is a hardship for her due to her medical condition. Given Plaintiff's medical condition, this conduct could rise to the level of adverse employment action. *See Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-70 (2006) (explaining that while a change in work schedule may not matter to most employees, such a change may matter significantly to a parent of school age children).

Therefore, most of the alleged actions qualify as adverse employment actions. Additionally, the total weight of Defendant's actions against the Plaintiff, her husband, her son, and BRCS taken together, may establish this element. If Plaintiff can show that all Defendant's actions against her and her family members were taken to retaliate against her for the protected speech, a reasonable jury

33

can find in Plaintiff's favor. Summary judgment, therefore, is not appropriate.

### e. There is a genuine issue of material fact as to causation

Plaintiff must establish that protected conduct was a "substantial factor" or a "motivating factor" in Defendant's adverse actions. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). If plaintiff carries this burden, the court should determine whether defendant would have reached the same decision as to the adverse actions in the absence of the protected conduct. *Id.*

To determine whether plaintiff presented sufficient evidence for a reasonable jury to conclude that her protected speech was a substantial factor motivating the adverse action, the court must examine the record as a whole. *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1291 (11th Cir. 2000). There is no single standard for determining whether plaintiff presented sufficient evidence to meet her initial burden. *Id.* The Eleventh Circuit identified several relevant factors to be considered, including: (1) the temporal proximity between the adverse action and the protected activity; (2) whether any reasons for the adverse action were pretextual; (3) whether any comments made, or actions taken by the employer indicate the adverse action was related to the protected speech; (4) whether the asserted reason for the adverse action varied; and (5) any circumstantial evidence of causation, including such facts as who initiated any internal investigations or termination proceedings, whether there is evidence of management hostility to the speech in question, or whether the employer had a motive to retaliate. *See Kamensky v. Dean*, 148 Fed. App'x. 878, 881 (11th Cir. 2005) (citing *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1291 (11th Cir. 2000)). No single factor is outcome determinative, but all factors must be taken into account. *Id.*

34

**i. There was sufficient temporal proximity to infer causal connection between Plaintiff's speech and some of the alleged adverse actions but no varied explanations for adverse actions taken**

Gaps in time, standing alone, do not preclude a plaintiff from producing enough evidence for a reasonable jury to find that protected conduct was a substantial factor causing the adverse action. *Stanley v. City of Dalton, Ga.*, 219 F.3d 1280, 1291 (11th Cir. 2000) (discussing cases with eighteen months and ten months gaps). However, when there is no temporal proximity, causation cannot be inferred, and other factors must be considered. *See id.*

Here, Plaintiff's protected speech took place in February - June, 2005 and in August - October, 2007. Defendant's denial of the use of J.C. Mitchell school buildings to BRCS followed closely Plaintiff's communications with Dr. Johnson and then-Attorney General Charlie Crist. Then, the demolition was moved up from August, 2005 to June 1, 2005. Therefore, these events were close enough to Plaintiff's speech to infer causation for the purposes of summary judgment. Then, Defendant began to withhold funds from BRCS in February, 2006, or approximately seven months later. This may be sufficiently temporally close to infer causation.

However, the fact that Mr. Nash was excessed for the first time in May of 2004, or prior to any protected activity by the Palntiff, cannot have been caused by Plaintiff's protected speech. Mr. Nash was excessed for the second time in May of 2007, or nearly two years after Plaintiff's 2005 protected activity and prior to the 2007 activity. Thus, there was no temporal proximity between Plaintiff's protected speech and alleged Defendant's adverse action against Mr. Nash.

Similarly, alleged adverse actions against Mr. Utterback took place in July, 2007 and May, 2009, or approximately two years after each instance of Plaintiff's speech. Actions taken against Plaintiff herself were likewise spread out in time (demotion in May, 2007; change of leave policy

in February, 2008; failure to offer a position close to home and assignment to a distant school in June, 2008; denial of an opportunity to switch locations in April, 2009; and denial of a position close to Plaintiff's home in April, 2011) and did not closely follow Plaintiff's speech. Therefore, there is no temporal proximity sufficient to infer causation. Additionally, different Defendant's employees were involved in various alleged adverse actions. Likewise, there is no evidence of varied explanations for adverse actions taken. However, this does not end the inquiry.

### ii. There is evidence of comments made indicating causation

Plaintiff alleges that Principal Licata told her in a confrontation on July 5, 2005 that he had overheard "higher ups" talking about "do[ing] things" to the Plaintiff. Pl.'s Decl. ¶ 11 (DE 46). Likewise, Mr. Chuck Shaw informed Plaintiff that unidentified "school district officials" had directed the legal staff and/or the Charter School Department to find something to shut down Plaintiff's school after it opened. *Id.* at ¶ 12.

Hearsay, or evidence in inadmissible form, can be considered at the summary judgment stage as long as this evidence is otherwise admissible and will be presented in an admissible form at trial. *See McMillan v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996); *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999). Here, statements of currently unidentified declarants may not be hearsay if Plaintiff calls Mr. Licata and Mr. Shaw as witnesses, and offers statements of currently unidentified declarants as statements of the opposing party, as long as these declarants were authorized to make statements on the subject. *See* Fed. R. Evid. 801(d)(2). Therefore, there is evidence of comments indicating causation for the purposes of summary judgment.

### iii. There is circumstantial evidence of hostility towards Plaintiff's protected speech

The record shows that Plaintiff was an outspoken critic of Defendant's treatment of charter

schools. While charter schools are created and overseen by the School District, they, by nature, are also in competition with the District. For example, some of the statutory purposes charter schools may fulfill are to "[p]rovide rigorous competition within the public school district to stimulate continual improvement in all public schools," and to "[c]reate new professional opportunities for teachers, including ownership of the learning program at the school site." Fla. Stat. § 1002.33(2)(b). Therefore, Plaintiff, as the Principal of BRCS, was, on one hand, Principal of a public school in the Defendant School District, and, on the other hand, an outspoken critic of the District's charter school policies. This necessarily created hostility, as Plaintiff alleges, towards her protected speech on this subject.

For example, Dr. Johnson was present when Plaintiff criticized Defendant's policies in front of the State Board of Education on September 18, 2007 and October 16, 2007. At the October meeting, Plaintiff spoke against Defendant's full control of the charter schools, Dr. Johnson spoke in favor of it, and the Board's vote ultimately sided with the Plaintiff.

Additionally, Plaintiff submitted an affidavit of Marcia Andrews, which was filed in another case against the Defendant. (DE 49-10). Ms. Andrews states:

> I have worked with Arthur Johnson for many years. Through my experience in working with him I know that if he has an employee who is not a "team player", i.e. someone who ask [sic] questions or takes an unpopular stance, it has been his practice to retaliate against that employee by taking whatever steps necessary by moving them to other positions, demoting them to keep them quiet. He usually uses others to do his underhanded work.
> *Id.*

While Dr. Johnson testified that the issue of control over charter schools became moot when a court ruled that the state could not be an authorizing agent of charter schools, *see* Johnson Dep., 127:1-130:25 (DE 49-7), there is a genuine issue of material fact as to whether Plaintiff's protected

speech caused Defendant to take adverse actions against her and her family members.

### iv. Pretext

Defendant argues that Plaintiff experienced no change in location, duties, or pay relating to her demotion in 2007. Def.'s Statement of Material Facts, ¶ 32 (DE 30-1). Defendant asserts that the change in the charter school leave of absence policy was due to challenges Defendant was experiencing in finding appropriate assignments for administrators returning from such leave. *Id.* at ¶¶ 34-42.

Defendant further argues that Plaintiff was administratively assigned to the school where she presently works upon her return from leave because she is an employee of the School district, which covers all of Palm Beach County. *Id.* at ¶¶ 44-52. Also, Plaintiff declined a position in Riviera Beach and applied to no positions in Boca Raton as no assistant principal of adult education positions were available in Boca Raton. *Id.*

Defendant asserts that Florida Department of Education has found no bases for unlawful reprisals in response to Plaintiff's complaints. *Id.* ¶¶ 23-30. In response to Plaintiff's allegation that her husband was unlawfully recommended for non-reappointment, Defendant states that the school principal recommended non-reappointment, that the issue was challenged and reversed, and that Plaintiff's husband remains an employee of the Defendant. *Id.*

However, Plaintiff argues that the charter school leave of absence was directed at her because she was the only administrator on charter school leave of absence when the policy was changed. Pl.'s Decl. ¶ 14 (DE 46). Further, Plaintiff asserts that the position she was offered in Riviera Beach would have resulted in approximately the same commute for her and a reduction in duty days. *Id.* at ¶19. Plaintiff states that an appropriate position in Boca Raton was open when she was assigned

to her present school, and that another equivalent position became available in Boca Raton in 2011, but that she was not allowed to apply for either of these positions. *Id.* at ¶¶ 16, 22. Therefore, there is a genuine issue of material fact as to whether Defendant's reasons for taking adverse actions were pretextual. Overall, it is not appropriate to conclude that a reasonable jury could not find in favor of the Plaintiff on the issue of causation.

### f. There is an issue of material fact as to whether Defendant would have taken the same actions in the absence of Plaintiff's protected speech

Finally, because the government may still prevail if it proves by a preponderance of the evidence that it would have taken the same action in the absence of the protected conduct, *see Morgan v. Ford*, 6 F.3d 750, 754 (11th Cir. 1993) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968)), the Court must now examine whether a reasonable jury could not find for the Plaintiff on this issue. As discussed above, a genuine issue of material fact remains in relation to this question.

Overall, accepting Plaintiff's evidence as true and drawing all reasonable inferences in Plaintiff's favor, as the Court must at this stage, it is not possible to conclude on this record that a reasonable jury could not find in favor of the Plaintiff.

### B. Association claim

Associational activities relating to political, economic, religious or cultural matters are protected by the Fourteenth Amendment to the Constitution. *N.A.A.C.P. v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460-61 (1958). The same interpretation is applicable to the right to association secured by the First Amendment. *Sawyer v. Sandstrom*, 615 F.2d 311, 315-16 (5th Cir. 1980);[11] *Wilson v. Taylor*, 733 F.2d 1539, 1543 (11th Cir. 1984) (overruled on other grounds by *Jett*

---

[11]The Eleventh Circuit, in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), adopted as binding precedent all decisions of the Fifth Circuit rendered prior to

*v. Dallas Ind. Sch. Dist.*, 491 U.S. 701 (1989)). Membership in organizations is likewise protected under the First Amendment. *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1320 (11th Cir. 2005). Thus, the subject matter of the association is "immaterial." *See N.A.A.C.P. v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460-61 (1958).

A public employee's associational activities must be undertaken as a citizen, but do not have to be on matters of public concern. *D'Angelo v. Sch. Bd. of Polk Cnty.*, 497 F.3d 1203, 1212-13 (11th Cir. 2007). The *Pickering* balancing test applies, as well as the causation analysis under *Mt. Healthy. Hatcher v. Bd. of Public Educ. and Orphanage for Bibb Cnty.*, 809 F.2d 1546, 1559 (11th Cir. 1987); *Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d at 1321 (11th Cir. 2005).

Plaintiff bases her association claim on the association with other charter schools to "lobby for their mutual benefit and protection, lobby elected officials to prevent the waste and misexpenditure [sic] of public tax dollars and to publicly oppose the unlawful and wasteful action of the Defendant, Mr. Johnson."[12] Compl. ¶ 23 (DE 1-2). Plaintiff argues that her association claim is premised primarily on her activities appearing before the State Board of Education to oppose Dr. Johnson's request to retain exclusive control over charter schools in Palm Beach County. Pl.' Memorandum of Law, p. 10 (DE 47). These activities, which are similar to a membership in an organization and to political activities are protected under the broad interpretation of the freedom of association.

The analysis of the Plaintiff's free speech claims is also applicable to her association claim with the exception of the public concern component. Therefore, according to the foregoing analysis,

_____

October 1, 1981.

[12]Mr. Johnson is not a Defendant in this action.

there is a genuine issue of material fact as to Plaintiff's association claim, and summary judgment is not appropriate.

However, this does not complete the analysis because the Court must now consider whether Plaintiff alleged sufficient facts to establish that the School Board can be held liable under *Monell v. Dep't of Social Serv. of City of New York*, 436 U.S. 658, 690 (1978).

### C. Municipal Liability

In *Monell*, the Supreme Court held that local government entities can be liable for deprivations of constitutional rights under § 1983. 436 U.S. 658, 690 (1978). However, liability may only attach when the final policymaker of the governmental entity caused the deprivation through governmental "custom," which may not have been formally approved through the official channels. *Id.* at 691. Additionally, local governments cannot be held liable simply by virtue of an employee-employer relationship with the tortfeasor, or based on the *respondeat superior* theory. *Id.* Plaintiff has the burden of establishing the existence of a municipal policy. *K.M. v. Sch. Bd. of Lee Cnty. Fla.*, 150 Fed. App'x, 953, 957 (11th Cir. 2005).

Local governmental entities, such as school boards, have been found liable under § 1983 for constitutional torts where plaintiff proved that (1) the constitutional deprivation was caused by a policy or custom of the local governmental entity; or (2) a single act of the final policymaker of the local governmental entity when (a) the final policymaker acted with deliberate indifference to the constitutional deprivation, or (b) the final policymakers of the governmental entity delegated their authority to a subordinate, who caused the constitutional deprivation, or (c) the policymakers of a local governmental entity ratified a constitutionally impermissible decision or recommendation of a subordinate or employee. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality

opinion); *Bd. of Comm'rs of Bryan Cnty. Okl. v. Brown,* 520 U.S. 397, 406-14 (1997); *Sherrod v. Palm Beach Cnty. Sch. Dist.*, 424 F. Supp. 2d 1341, 1344 (S.D. Fla. 2006). A single act of the final policymaker may subject the municipality to liability because it is the final policymaker who is acting. *See Bd. of Comm'rs of Bryan Cnty. Okl. v. Brown,* 520 U.S. 397, 406-14 (1997).

To hold a governmental entity liable for a constitutional violation, the court must identify some affirmative official policy that a reasonable jury could understand as calling for the violation. *Holloman ex rel. Holloman v Harland,* 370 F.3d 1252, 1293 (11th Cir. 2004). To the extent Plaintiff argues that Defendant's amended charter school leave policy for administrators is such a policy, the argument does not appear to have merit. The policy on its face deals only with leave. Def.'s Statement of Material Facts, ¶¶ 34-35 (DE 30-1). However, Plaintiff also argues that the act of changing the policy was a deliberate act of retaliation against the Plaintiff because she was the only administrator on charter school leave of absence affected by the policy change. This and other acts alleged by the Plaintiff create an issue of material fact as to whether these actions may qualify as single acts attributable to the School Board that rose to the level of policy or custom.

### 1. School Board is the final policymaker

First, it is a question of state law who or what body is the final policymaker. *K.M. v. Sch. Bd. of Lee Cnty. Fla.*, 150 Fed. App'x, 953, 957 (11th Cir. 2005). Florida Statutes vest the final policymaking authority for a school district with the School Board. *Id.*; *Sherrod v. Palm Beach Cnty. Sch. Dist.*, 424 F. Supp. 2d 1341, 1344 (S.D. Fla. 2006) (citing Fla. Stat. §§ 1001.32(2), 1012.22, and 1012.33). In relation to personnel, a district school board shall designate positions to be filled, prescribe qualifications for those positions, and provide for the appointment, compensation, promotion, suspension, and dismissal of employees based on written recommendation submitted by

the superintendent for positions to be filled and for persons nominated to fill such positions. Fla. Stat. § 1012.22(1). According to the statute, the board may reject for good cause any employee nominated. *Id.* The superintendent is charged with the responsibility of recommending policies to the school board that the superintendent may consider necessary for the school district's efficient operation. Fla. Stat. § 1001.49. The superintendent is also responsible for making recommendations to the board on personnel matters. Fla. Stat. § 1012.27.

Plaintiff relies on School Board of Palm Beach County Rule 1.035 governing policy presentation to the School Board and on Dr. Johnson's testimony at his deposition[13] regarding the superintendent's and the school board's responsibilities. (DE 50-12). Rule 1.035 states that before any policy may be presented to the School Board for development, the Superintendent's Leadership Team and the Superintendent must approve the proposed policy. According to the Plaintiff, the Superintendent is the final policymaker on personnel matters because, unlike on the matters of the budget, boundaries, and other non-personnel related issues, the School Board may only reject the Superintendent's recommendation for good cause. *See Greene v. Sch. Bd. Of Hamilton Cnty.*, 444 So.2d 500, 501 (Fla. 1st DCA, 1984).

However, final policymaking authority over a subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review. *Quinn v. Monroe Cnty.*, 330 F.3d 1320, 1325 (11th Cir. 2003) (quoting *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997)); *cf. Holloman ex rel. Holloman v Harland*, 370 F.3d 1252, 1293 (11th Cir. 2004) (school principal was the final policymaker on administering corporal punishment or was delegated the final

---

[13]Pages 79-86 of the deposition transcript upon which Plaintiff relies in this section of the memorandum of law were excluded from the exhibit that Plaintiff submitted. However, Florida law informs the analysis.

authority because review of the principal's decision to administer corporal punishment, while technically available, could not reverse the punishment that was administered and there was no provision or possibility of pre-punishment review).

Here, the statute contemplates that the Superintendent makes recommendations on personnel matters to the School Board, and that the School Board may reject Superintendent's recommendation on a personnel matter for good cause. This is not a review without meaning. Also, the argument that the type of review when the Board can only reverse for good cause is not a meaningful review can be made in relation to most appeals, because a decision below will not usually be overturned unless there is good cause to do so. Therefore, the multi-member School Board, and not the Superintendent, has the final policymaking authority under Florida law. *K.M. v. Sch. Bd. of Lee Cnty. Fla.*, 150 Fed. App'x, 953, 957 (11th Cir. 2005) (under Florida law school board is the final policymaker); *Sherrod v. Palm Beach Cnty. Sch. Dist.*, 424 F. Supp. 2d 1341, 1345 (S.D. Fla. 2006) (same).

### 2. There is a genuine issue of material fact as to Defendant's potential liability under *Monell*

Plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate plaintiff's constitutional rights must demonstrate that the municipality acted deliberately; simple or even heightened negligence is not sufficient. *See Bd. of Comm'rs of Bryan Cnty. Okl. v. Brown*, 520 U.S. 397, 407 (1997).

A municipal government delegates its final policymaking authority when the delegation is such that the decision is not subject to review by the policymaking authority. *Holloman ex rel. Holloman v Harland*, 370 F.3d 1252, 1291-92 (11th Cir. 2004). For example, when a higher official has the power to overrule a decision but in practice never does so, the decision may represent the

effective final authority on the question. *Id.* at 1293 (quoting *Bowen v. Watkins*, 669 F.2d 979 (5th Cir. 1982)).

Here, Plaintiff stresses that Dr. Johnson was the driving force behind all the actions taken against the Plaintiff and her family and that the School Board essentially rubber-stamped all his decisions. As discussed earlier, Florida law establishes that the School Board has the final policymaking authority. A reasonable jury could conclude, though, that while the Board has the authority to not accept the Superintendent's recommendations in practice it never does so, and the liability will then attach.

To establish municipal liability on the theory of ratification, plaintiff must show that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the decision and the decision's basis. *Garvie v. City of Fort Walton Beach*, 366 F.3d 1186, 1189 (11th Cir. 2004). Alternatively, to succeed on the theory of deliberate indifference, a plaintiff must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a particular constitutional right will follow the decision. *Bd. of Comm'rs of Bryan Cnty. Okl. v. Brown,* 520 U.S. 397, 407 (1997). The court must carefully examine the causal link between the policymaker's inadequate decision and the particular injury alleged to keep municipal liability distinct from *respondeat superior* liability. *Id.* at 407-09.

Plaintiff alleges several instances when she informed, or potentially informed, the School Board of the alleged retaliation against her and her family. Plaintiff complained to the Florida Department of Education or filed unlawful reprisal actions because of the treatment Plaintiff and her husband were receiving in May, July and November of 2007, as well as in May of 2009. Pl.'s Decl. ¶¶ 8, 10, 13, 20 (DE 46). It is reasonable to infer that Florida Department of Education informed

the School Board of Plaintiff's allegations.

On May 27, 2009 and June 3, 2009, Plaintiff publicly addressed the School Board and complained about her husband's then-upcoming non-reappointment. *Id.* at ¶ 21. In 2009, Plaintiff discussed her hardship resulting from the long commute to work with Frank Barbieri, a member of the School Board. *Id.* at ¶ 16. In August, 2011, Plaintiff also sent Mr. Barbieri her resume and cover letter to apply for an assistant principal position in Boca Raton, the position that was never posted and ultimately filled with another person. *Id.* at ¶ 22.

Therefore, there remains a genuine issue of material fact as to whether the School Board reviewed the Superintendent's recommendations and agreed with both the recommendations and the Superintendent's alleged impermissible retaliatory motive. Alternatively, a reasonable jury may find in favor of the Plaintiff if it concludes that the School Board's decisions reflected deliberate indifference to the risk that a violation of Plaintiff's First Amendment rights will occur.

Overall, accepting Plaintiff's evidence as true and drawing all reasonable inferences in Plaintiff's favor, it is not possible to conclude on this record that a reasonable jury could not find in favor of the Plaintiff.

## CONCLUSION

In light of the foregoing, Defendant's Motion for Summary Judgment is **DENIED**.

**DONE and ORDERED** in Chambers this 8 day of June, 2012, at West Palm Beach in the Southern District of Florida.

*James M. Hopkins*

_____

JAMES M. HOPKINS
UNITED STATES MAGISTRATE JUDGE

Copies to:  All Counsel of Record